Good afternoon. The clerk informs me that everyone has signed in for the cases to be argued, so we'll dispense with the reading of the calendar and we'll turn to counsel in USA v. Edward Morris Weaver. Thank you, Your Honor, and may it please the Court, George Hicks for Appellant Edward Ned Weaver. As CEO of VennStar, Ned Weaver did something that thousands of individuals and marketed by VennStar, including potential buyers, Mr. Weaver added to a three-page contract clear, prominent, and detailed disclosures for potential customers to review and acknowledge before committing their money to VennStar and purchasing vending machines. The disclosures expressly and unambiguously described the limited nature of the bargain to potential for the machines the purchaser did. It did not have any financial relationship with locators, and the written contract constituted the entire agreement between the parties. No representations beyond the agreement influenced a decision to purchase. Given these particular prominent disclosures in a three-page contract, no reasonable person could consider VennStar's noncontractual representations important to a decision to purchase vending machines. Let's suppose hypothetically, I know that you dispute it, that Mr. Weaver actually affirmatively encouraged his salespeople to make false statements to the customers in the hopes that they would be persuaded and that they wouldn't read the disclaimers and indeed advised his salespeople that they should say, as apparently the salespeople here did say, that that's all contractual mumbo-jumbo, pay no attention to it. He would be exempt from criminal liability because those disclaimers are in the contract? Your Honor, again, I think we, to begin with, would take issue with the I understand, but if he did, is it your argument that whatever the salespeople said would be immaterial because the disclaimers are there and a reasonable person would have read them and disregarded what the salespeople said? I think that in the context of these particular disclosures, which not only Is this a yes coming or a no coming? I believe it is a yes. It would be unreasonable, given that the disclosures here were of both a specific detail, but also broad nature in the sense that not only did they sort of have a procedural element to them in the sense of do not regard anything you have previously heard or that is outside the contract, like we see in thousands of contracts every day, but also they provided at least specific critical facts to potential customers before they committed money. So I think the most critical fact of all being Venstar does not guarantee earnings and I think there would be no more critical fact for any potential customer, regardless of what they might have heard. So when we are talking about who is the objective, reasonable person looking at this, again, I think if we were looking at a 50-page contract, a contract of adhesion of sorts, or something where you have got fine print buried somewhere, that's one— A fraudster who specifically intended to have, to make representative, forget the sales people, if somebody personally put these things in his contract and called people up and told them, here is a whole bunch of falsehoods about how you are going to make a lot of money, a lot of misrepresentations, and one of them said, oh, but it says in the contract I shouldn't pay it, rely on that, and he said, oh, go ahead, that's just in there to satisfy the trust on this, you are going to make a million dollars for sure. That would not be a crime, even though the person intended that the customer would rely on what was said rather than what was written. Well, I think that if you look to what standard contract law would say in context beyond the criminal— That's in the context of civil fraud, not in the case of whether the person I describe engaged in a scheme to defraud. Understood, but two responses to that, Your Honor. First of all, I don't think that there should be or is a sort of parallel universe of contract law that does not apply in criminal case. That's a yes again. Again, you are saying that that would not be a crime. But to answer your—but to give my second response to your question, it would be that when you—this is not a situation where you've got some sort of—as the government concedes in its brief on two occasions, on 26 and again on 27, their argument is not that there was some sort of fraud or scheme to defraud before there was a consummation of the contract. And so I think that is another limiting factor here. They say customers would not have done business with a Venstar had they known the truth, the truth being provided in the contract done business, meaning actually committing money, or on 26. No, it would follow that the salespeople also would not be guilty of a crime. I know you don't represent them, but your argument would exonerate them as well, would it not? I—you know, I think that perhaps in this case it might, in another case it might not, but I think that there are actually meaningful differences in some of the other issues we present between ourselves, Mr. Weaver, and the salesman. For example, to talk about, for example, the improper closing argument, you know, which I do want to touch on before my time is up, you know, I don't think there's—I think that you can tell by looking at the government's response to this how they divide up this improper closing argument, and I'll just read what the prosecution actually said in its rebuttal, which was the last thing that was—the jury heard before it retired. This is not a case that depends on one or two co-conspirators. You heard from eight of them to disregard their testimony. You have to believe that the eight of them pulled this conspiracy off on their own, by themselves, without the knowledge and approval and involvement and assistance of Weaver. Now, I think it's very hard to come away from that, you know, with any impression other than that using the co-conspirators' guilty pleas as evidence of Mr. Weaver's guilt, and I think this is shown by the government's brief where it's diffused the prejudice from us, and I think that to sort of distinguish between Mr. Weaver and the salesman, you know, Mr. Weaver was the CEO, and I think it would be very impressionable upon a jury to think, well, yeah, it actually would be very hard for these guys to pull off this conspiracy and fraud to which they have admitted without the head guy there. Now, the government then pivots to saying that, well, there was a limiting instruction to— Why is—I'm sorry, why isn't that a good argument, that it would be hard for them to carry off this fraud that they admitted to not just in guilty pleas but in their testimony, without the help of the CEO? That's an improper argument? Well, no, I think that what—in the context of this particular argument where they're using—the prosecution is using the guilty pleas to tie in, to say that there's no way that they could have done this without Mr. Weaver because, you know, their guilt implies his guilt. And I think that, again, the fact that the government doesn't really confront that in its brief is telling. And as far as the curative instruction, I just want to point out that there's no case that the government cites in which a standard jury instruction was found to have cured an improper prosecution argument of this point. Are you distinguishing the guilty plea from the testimony? Yes, Your Honor. We do not have a quarrel with the introduction of the guilty pleas, and that is permitted under— Would the argument then be permissible based on the testimony alone that says, I did it? No. Our argument is that it's impermissible based on the use of those guilty pleas to tie in— I understand. That's what I'm asking you. Are you distinguishing between an argument based on an admission from the witness stand as against an argument based on a guilty plea to the same activity? I don't think that we would—I don't think that we would distinguish between the two. I mean— So once the witness says on the stand, I did it, you think it's improper for a prosecutor to say, he wouldn't have said yesterday at trial that he did it, unless the boss knew about it? No. I think that what's improper is to use that I did it as, well, therefore, the guy who's on defense here must have done it as well, which is what I think this improper argument did. But to say—that's what I'm looking for. Once the witness says, I did it, in testimony, what's improper about saying, and he wouldn't have done that, what he told you, if the boss didn't know about it? What's the impropriety? Because I think that you're taking that particular guilty plea and you're implying—I mean, that when you say, you know, they all had to have come in there, eight of them, not just one of them, but eight of them came in here because they couldn't have pulled this conspiracy off on their own. And I think that when you take that in conjunction with then saying without the knowledge and approval and involvement and assistance, you know, I think you're taking the predicate of— Suppose instead you had ten—no cooperators, but various witnesses say, these salespeople told me this, and the prosecutor says, you know, there's absolute evidence, incontrovertible evidence that the salespeople did this, and there's no way they could have done it without the boss knowing about it, given what the operation was otherwise like. That would be improper too? I think that it would be a different case, but I think it would be close to improper as well. But I think that it's an even easier case than we have right here. Are you doubting the logic of the argument, or are you just saying, in effect, it proves too much? In other words, you're not saying it's illogical to think—to argue that the boss would not have been unaware of what all these people were doing. You're not saying there's a logical flaw there, are you? Well, what I'm saying is that there are many ways to—this particular argument come up in the context of trying to diffuse the guilty pleas by these co-conspirators, and there are many other ways of doing so besides this particular means of doing so. I hear what you're saying, but I don't think you're quite dealing with what I'm asking you. I'm asking, do you think it's illogical, or to put it another way, is it an impermissible inference, as a matter of inference drawing, to make the argument? Is that your point? No, I don't think it's illogical, if I may explain. Oh, okay. So it's illogical. But your point is it sort of proves too much, that you're asking the jury to find the boss guilty because they're guilty. That's correct. That's— So it's not that it's illogical in its reasoning. It's that it's too strong. Right. It's that it's taking guilty pleas and applying them to Mr. Weaver by virtue of the co-defendant's guilty pleas, without a sufficient curative instruction, which again is not anywhere in any of the cases— Thanks, Mr. Hedges. —by reserve. Thank you. You certainly have. Mr. Leder? Made police of court, I'm Douglas Leder from the United States Department of Justice here, representing the United States in this case. With me today is Mr. Will Haveman, also from the Department of Justice civil appellate staff, and Patrick Jespers. Mr. Jespers was the lead attorney, the prosecutor in the trial. I'd like to—I'll start with the way my friend Mr. Hicks ended. I commend to this by judge, the district judge, the trial judge, Judge Azraq, because in a very thorough ruling, 48 pages denying motion to—for a new trial and a quit, she thoroughly dealt with all of the arguments that are being made by Mr. Weaver. And in particular, for instance, on this last point, there are various reasons why Mr. Hicks' argument is incorrect, but if you look at the final, the end of Judge Azraq's opinion, she makes clear this—at most, this was just an isolated remark during closing argument. It mattered not at all because the judge issued a very clear instruction, and she said, quote, moreover, given the abundance and variety of evidence arrayed against defendants at trial, there is a strong certainty that the defendants would have been found guilty in the absence of this single remark. And in addition, this Court in the Bonke case and others has made clear that this type of remark, a single remark at closing argument, will almost never be sufficient to overturn a jury verdict in a case like this. But in any event, nothing that was said by Mr. Jaspers was improper because what he was doing was rebutting the many attacks that were made on the credibility of these cooperators, and he was merely pointing out to the jury why these people were credible. Um, perhaps I should have started out by saying, as I know the judges know, but I'd like to remind— I don't quite understand your credibility argument. Yes. The objection to what was said is that their testimony was used to show the boss was guilty, not to shore up the credibility of the testifying witness. You're saying it's relevant to credibility. He's arguing what's improper is the inference from their credible testimony. Right. And instead, remember, these are people who testified that Weaver knew all about what was going on. And again, parroting Judge Azraq, there's massive evidence in the record that the jury obviously found convincing to show that he knew exactly what was going on. He was heavily involved in it. The defense then attacked the credibility of these witnesses, saying to the jury, don't listen to them. They're just trying to buy an easy sentence. And Mr. Jaspers was saying, no, no, they are actually credible. And part of that is, really? Do you think these eight people would have pled guilty, all of them? And all of them would have been testifying about everything that was going on in this small office? And all of them are lying? So he was, he was rebutting the attacks on their credibility, saying this is a lot for the jury to have to swallow, that all of these people would have been lying about how involved Mr. Weaver was. So that's why it was bringing back their credibility. But in addition, again, as Judge Azraq found, this is all irrelevant anyway, because this is just nowhere near the type of showing that would have to be made in a record like this to overturn a jury verdict. And, you know, that brings me to maybe where I should have started, which is, again, as this Court knows, you view the evidence in the light most favorable to the government, overturn jury finding, including findings as to materiality, defendant's intent to defraud, falsity of defendant's statements, only if no rational jury could make that finding. And again, Judge Azraq, who presided over this six-week trial, just agreed completely with the jury on the various arguments that were made that there was nothing wrong here. Mr. Hicks started out by saying, well, they tried to cover themselves by putting in this record, by overcoming all of the many, many misrepresentations that were made. But there are several problems with that. First of all, the crime occurred through the statements, all of the things that the various defendants, the salespeople and Weaver, did to fool these victims, these people, the customers who bought these machines. So the crime was done when the lies were told as part of this massive fraud scheme. So what happens after that doesn't undermine the fact that the crime had occurred. In addition, as Judge Azraq pointed out— But you're saying that the appellant's argument has to be essentially a factual one, that the presence of these disclaimers totally refutes any inference or argument that he intended to defraud anyone? I think that's right, Judge Lynch. And that argument just won't fly here at all, because victims testified, a number of victims testified, that they were totally misled, that they relied on these misrepresentations. And more important, as Judge Lynch mentioned in, I think it was your opening question, they said they relied on the fact that the salespeople said to them, oh, that's just legal mumbo-jumbo. Don't pay attention to that. So surely we can't allow the mail fraud and wire fraud statutes to be totally undermined by people who fool a whole batch of retirees, and then at the end say—and the retirees who testified, they believed those representations. Those representations were key to them. And then at the end say, oh, don't pay any attention. Now, again, even with that, remember that Weaver and the people who were all part of this were saying, especially don't pay any attention, it's just that stuff for the lawyers. But there's even more than that. Remember that the evidence here showed that Weaver had the salespeople tear off, rip off the front page of the contract. The front page was a required warning to these customers saying, check with a lawyer, look into this, don't, just accept it. Well, obviously, Weaver and the salespeople didn't want anybody to do that. They wanted to move very, very fast, get these potential customers talking to the duplicitous locators, et cetera. They didn't want anybody talking to a lawyer. They didn't want anybody thinking. And so the—I think the testimony was the wastebaskets in the salesroom were overflowing with these front pages that had been ripped off, as Mr. Weaver wanted. There is a restitution aspect of the sentence, is there not? Yes, there is, Your Honor. Does that create an anomaly? Mr. Hicks would say that these victims could not have recovered in a civil fraud or contract action because of the disclaimers, but they're effectively recovering grace of the government. I don't think there is an anomaly, Your Honor. I'll point out the obvious first point, which is Mr. Hicks has not raised this, but I don't think there is an anomaly because, remember, this is a criminal case, which has been pointed out again by Judge Azzarack, that what needs to be shown for civil liability fraud in this kind of circumstance is very different from criminal. And this is a restitution order as part of the criminal case. So the first part would go only to were they properly convicted, and then the judge issued, I think, a $6.1 million restitution order, which obviously will come nowhere near making the victims whole. You have a higher burden to establish the fraud, but since you don't have to prove reliance, it's a little easier. So one element is tougher, the other is more lenient. The result is you move the money without proving reliance. That's correct, Your Honor. And you do it via a criminal prosecution. The criminal prosecution and then the restitution order, which, as we know, is intended to try to make victims whole. And remember, Your Honor, there was massive evidence at the trial of that these victims lost, you know, $10,000, $15,000, $18,000, their life savings, et cetera. About $62 million, I think, was taken from them, and the judge was ordering restitution of $6.1. And this case was brought by the Civil Division of the Justice Department? Very proudly, Your Honor. Despite its name, the Civil Division has a Consumer Protection Branch, which is where Mr. Jespers sits, and about half its docket is criminal. We protect consumers. So it's FDA crimes, steroids, et cetera, crimes involving consumers, odometer tampering, things like this case, this type of consumer fraud, yes. And then in the appellate staff we often handle this. It doesn't matter one way or the other. I'm just curious. Maybe we could make it the Civil and Consumer Protection Branch Division. Was the case tried by attorneys from Maine Justice? Yes, Your Honor. Yes, Mr. Jespers and Alan Phelps are from the Maine Justice. The United States Attorney at the time, Loretta Lynch, in the Eastern District, signed the indictment, but the case was prosecuted by Maine Justice. Now, is that standard practice in the Eastern and Southern Districts, or only Eastern, as far as we're concerned? Your Honor, it does happen in the Eastern District. I don't think, as I think Your Honor is well aware, I don't think it happens very often in the Southern District, if ever. That's what I was wondering. Eastern lets you in once in a while, is that it? You may not remember, but you and I had a conversation about this a number of years ago. It was a long time ago. Yes, the Maine Justice Department sometimes handles things from the Southern District, but it's not very often. The very last point, I'm sorry, I wanted to make. I'm a bit confused. Mr. Hicks said we conceded something at pages 26 and 27 of our brief. I just looked at them again. I think maybe he misspoke. We did not concede any of the points in this case. If the Court has no further questions, we urge that you affirm the judgments and then  Mr. Hicks, you've reserved two minutes. Thank you, Your Honor. Just a couple points. First of all, with all due respect to Judge Azarack, that is why we have courts of appeals, so I think you can render your own opinion on this. Second, when Mr. Leder was discussing the closing argument, I think it's very notable that he only talked about half of the argument. He did not talk about, and that's actually exactly what happened in the government's brief. They divided it up, whereas there are actually two components. The component that I was talking about earlier is by far the more problematic. Mr. Leder stopped at the earlier part, and then he talks about the sort of harmless error aspect of the closing argument, and frankly, I think if I were up here representing one of the salespersons, I think there may be a point to that, but when it comes to Mr. Weaver, the record is replete with written contemporaneous document evidence that is exculpatory, and on the other side of the ledger, we've got sort of post-hoc cooperating witness testimony from ten years later, and I think that when you put the two of them together, it's simply not a case for harmless error like Mr. Leder says, and I think the example he gives is a good point. This allegation about tearing off disclosures comes from literally one sentence of testimony by a cooperating witness. Now, counterbalance that with a contemporaneous written email by Mr. Weaver, wherein he says that I have told all regulators to come and inspect us and look at us and make sure that we are doing things properly. On the last point, Mr. Leder refers to the crime occurring earlier. Again, I can only refer you to the pages of their brief, pages 26 and 27, where the arguments they're making are inconsistent with that particular proposition, but be that as it is. Isn't it true, though, that is to say if there is a scheme to defraud and misrepresentations are made and interstate phone calls are made in furtherance of that scheme, crime's over then, right? Crime's happened. Well, under the Nader decision, that is the case. However, I think that Under the language of the statute that Congress passed Construed by Nader, yes. As under the literal language, it says if you conceive a scheme to defraud and in furtherance of that scheme, you mail a letter or make an interstate phone call, you are guilty of a crime. That is what the text of the statute says, but I think that brings me to my last point, which is if you take the government's view on that and you go back to, well, we're just going to look at these representations without looking at what happened afterwards, particularly with the disclosures, then I think that raises a problem in the sentencing context. Disclosures are fine as a jury argument, right? You're saying that the disclosures, like these various other statements that Mr. Weaver made, and apparently, I think this is conceded factually by the government, the statements that he made to the salespeople from time to time, all show that he did not have a fraudulent intent. So the disclosures matter in the case. Well, they matter in the sense, I mean, they got in for disproving his fraudulent intent, but the different argument from materiality, but I do want to get in the sentencing aspect, if I may. Thirty seconds. Which is to go to Judge Newman's point, at the sentencing context, you do have a reliance component, and to the extent that all these contracts, I mean, the government's entire argument on the culpability point is premised on the lack of reliance, whereas in the culpability statutory context, whereas when you're looking at the loss enhancement for sentencing, there is a reliance component, and when you have customers who have then disclaimed reliance, I think that you can't ignore that when you're looking at the sentencing, which brings the guidelines down to 20 to 30 months. Why is that so when you look to intended loss? Are we just again back to the question of what did he intend? Well, in intended loss, the requirement is what did the defendant purposely sought to intentionally, purposely puts these in for the express purpose of protecting customers is purposely intending to inflict that, and I would note that the government does not really spend any time on, much time on intended loss in its brief. It's really focusing on actual loss where reliance is indisputable. Thank you. Thank you very much.